CLAUDE O. MARKOE, ET AL., Plaintiffs

v.

LEGISLATURE OF THE VIRGIN ISLANDS and
HENRITA TODMAN, ET AL., Defendants

Civil No. 77-68

District Court of the Virgin Islands

Div. of St. Croix

March 8, 1978

ALBERT A. SHEEN, ESQ. (HODGE & SHEEN), Christiansted, St. Croix, V.I., *for plaintiffs*

JOHN F. JAMES, ESQ. (JAMES & RESNICK), Christiansted, St. Croix, V.I., for *plaintiffs*

CHARLES R. BIDELSPACHER, ESQ., Christiansted, St. Croix, V.I., *for plaintiffs*

JAMES H. ISHERWOOD, ESQ. (ISHERWOOD, COLIANNI, AL-KON & BARNARD), Christiansted, St. Croix, V.I., for *plaintiffs*

GWENELLEN P. JANOV, St. Thomas, V.I., *for defendants*

RONALD T. MITCHELL, ESQ. (PALLME, ANDUZE, MITCHELL & DOW), St. Thomas, V.I., *for defendants*

CHRISTIAN, *Chief Judge*

## MEMORANDUM OPINION

This is an action brought by plaintiff, Claude O. Markoe, on his own behalf and that of all other persons similarly situated.[1]

---

[1] Initially, Claude O. Markoe was joined as a plaintiff by six of the seven senators of the Legislature of the Virgin Islands who reside in the legislative district of St. Croix, they being Senators Leroy F. Arnold, John A. Bell, Britain H. Bryant, Hector Cintron, Sidney Lee and Frits E. Lawaetz. The seventh senator from that legislative district, G. Luz A. James, did not join the action as a party plaintiff. However, throughout this opinion the Court deals with the action as one brought by Markoe only inasmuch as the Court early on in the litigation directed that the Legislature of the Virgin Islands be joined as a party defendant.

Plaintiff seeks to have this Court strike down as constitutionally impermissible the reapportionment scheme under which the Legislature of the Virgin Islands has been constituted since 1972. He alleges invidious discrimination in that the last decennial census prior to the enactment of the reapportionment plan showed that the legislative district of St. Croix had a population of 31,779 residents whereas the other legislative district, that of St. Thomas-St. John, was made up of a population some 1,090 persons less. Plaintiff contends that under the holding of Reynolds v. Simms, 377 U.S. 533 (1964) majority districts are to have majority representation. Plaintiff goes on to urge that since the Legislature of the Virgin Islands consists of 15 senators and a majority of 15 is 8, then the legislative district of St. Croix should have 8 senators and the legislative district of St. Thomas-St. John the remaining 7.

As plaintiff sees it, the majority of the 15 senators are now of the District of St. Thomas-St. John. That being so, he says, the minority is ruling the majority, thus denying that majority, not only due process of law but the equal protection of the laws, as well.

The wholly uncomplicated apportionment of the Legislature of the Virgin Islands is as set out in §§ 101 and 102 of Title 2 of the Virgin Islands Code. Under § 101 two legislative districts are ordained, the legislative district of St. Croix and the legislative district of St. Thomas-St. John. Under § 102 the 15 senators of the Legislature are apportioned as follows:

Seven (7) senators shall be elected by the qualified electors of the District of St. Croix and seven (7) senators shall be elected by the qualified electors of the District of St. Thomas-St. John. One (1) senator shall be elected at large by the qualified electors of the Virgin Islands from the Virgin Islands as a whole; provided, however, that such senator shall be a person who is a bona fide resident of St. John.

7

The senator required to reside in St. John is commonly referred to and will be designated in this opinion as the senator-at-large, and sometimes the at-large senator.

It is the position of plaintiff that under the teaching of Reynolds v. Simms no other basis of apportionment is to be constitutionally countenanced than naked population figures. Moreover, says plaintiff, the Court should look to no other source in resolving the instant dispute than the 1970 census figures. Says the plaintiff, this was all the Legislature had before it in 1972 when it passed the apportionment statute. The Legislature, urges plaintiff, considered nothing else but the census figures. It looked to nothing but population, and, concludes plaintiff, came up with an infirm plan which cannot pass constitutional muster. In plaintiff's view the 1972 reapportionment law of the Virgin Islands was invalid when enacted and must, for that reason, be struck down. Considerations that may have surfaced in the intervening years are of no account, plaintiff argues, and therefore, the Court has no alternative but to nullify the plan. Plaintiff complains that only the Court can be looked to for aid for, says he, the improperly apportioned legislature is determined to perpetuate the existing inequity, having had before it each year since 1972 bills to right the wrong of malapportionment, but such bills have never even advanced to the floor. Plaintiff therefore, seeks a prompt and summary order of this court directing that the Legislature of the Virgin Islands immediately be reapportioned giving 8 district senators to the District of St. Croix and 7 to the District of St. Thomas-St. John.

In examining and dealing with these contentions of plaintiff in the light of Reynolds v. Simms, one fact should be constantly borne in mind. Repeatedly the Supreme Court in Reynolds spoke of the disparate number of persons in the various legislative districts in the State of Alabama. But the language of the Court must necessarily be

8

weighed in terms of the glaring inequalities found by the Court in the State of Alabama. At the time the complaint came before the Courts in Reynolds, 25.1% of Alabama's population resided in districts represented by a majority of the members of the State Senate and similarly 25.7% of the State's population lived in districts which elected a majority of the members of the State House of Representatives.

■ Not surprisingly then, the Court addressed the issue raised in terms of population. That is not to say however, that the Court suggested or held as plaintiffs would have this Court believe, that no other yardstick than population is to be permitted. That raw population figures are not to be considered the Alpha and Omega of apportionment is made manifest by the Supreme Court when it stated that population is but "the starting point". Reynolds v. Simms, at 567. Throughout the opinion the Court, by repeated utterances, made it clear that while the word population was used, its true and ultimate concern was not with simply a head count. By way of illustrating this point the Reynolds opinion is liberally quoted as follows. Said the Court

> Undeniably the Constitution of the United States protects the rights of *all qualified citizens* to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage has made this indelibly clear. It has been repeatedly recognized that *all qualified voters* have a constitutionally protected *right to vote* . . . and to have their *votes* counted. (Emphasis supplied and citations omitted.) Page 554.
>
> The *right to vote freely* for the candidate of one's choice is of the essence of a Democratic society, and any restrictions on that right strike at the heart of representative government. And the *right of suffrage* can be denied by a debasement or dilution of the *weight of a citizen's vote* just as effectively as by wholly prohibiting the free exercise of the franchise. (Emphasis supplied.) Page 555.

9

The Court itself articulated the problem with which it was confronted as ". . . to ascertain, in the instant cases, whether there are any constitutionally cognizable principles which would justify departures from the basic standard of equality among voters in the apportionment in state legislatures." Page 561.

Further on in the opinion the Court went on to say

[s]ince the achieving of fair and effective representation *for all citizens* is concededly the basic aim of legislative apportionment, we conclude that the Equal Protection Clause guarantees the opportunity for *equal participation by all voters* in the election of state legislators. Diluting the weight of *votes* because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discrimination based upon factors such as race, . . . or economic status. (Emphasis supplied and citations omitted.) Pp. 565–566.

And finally, the said Court,

[a] *citizen,* a *qualified voter,* is no more nor no less so because he lives in the city or on the farm. This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. Page 568. (Emphasis supplied.)

And the holding,

We hold that, as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's *right to vote* for state legislators is unconstitutionally impaired when *its weight is in a substantial fashion diluted when compared with the votes of citizens* living in other parts of the state. (Emphasis supplied.)

Distilled to its essence then, the high court while articulating population, clearly had in mind population entitled and privileged to exercise the right of suffrage. What after all did Baker v. Carr, 369 U.S. 186 (1962), the precursor of Reynolds hold?

10

In Baker v. Carr, . . . we held that a claim asserted under the Equal Protection Clause, challenging the constitutionality of a state's apportionment of seats in its legislature, on the ground that *the right to vote* of certain *citizens* was affectively impaired since debased and diluted, in effect presented a justiciable controversy subject to adjudication by federal courts. Reynolds at p. 556.

Once more the emphasis was on citizen, voter. And in like manner Gray v. Sanders, 372 U.S. 368 (1963). The Supreme Court there found,

. . . the Georgia county unit system, applicable in Statewide primary elections, was unconstitutional since it resulted in a dilution of the *weight of the votes* of certain Georgia voters merely because of where they resided. Reynolds at p. 557. (Emphasis supplied.)

To be sure, the Court in Westbury v. Sanders, 376 U.S. 1 (1964),

. . . determined that the constitutional test for the validity of congressional districting schemes was one of substantial equality of population among the various districts. . . .

And certainly the Court went on to speak of making equal representation for equal numbers of people the fundamental goal. But even so, the Court harked back to citizenship and to voting saying

No right is more precious in a free country than that of having *a voice in the election* of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory *if the right to vote is undermined. Our constitution leaves no room for classification of people in a way that unnecessarily abridges this right.* Westbury v. Sanders at pp. 17–18. (Emphasis supplied.)

Reading Reynolds then as it does, this Court must decline to follow down the bare population avenue on to which plaintiff would lead it. The Court will look to other thoroughfares to determine whether or not the 1972 ap-

11

portionment plan of the Legislature of the Virgin Islands measures up to constitutional norms.

I first turn to the distribution of registered voters as a potential basis for proper legislative apportionment. The Reynolds Court while seemingly emphasizing that voting power was the key, spoke in terms of three potential bases: total population, citizens, and voters, leaving it unclear just which of the three it favored. Two recent Supreme Court decisions have shown a preference for using registered voters as a basis. As Gaffney v. Cummings, 412 U.S. 735 (1973), reads Reynolds, it is the weight of a person's vote that matters, not the number of persons in the legislative district. As the Court said

All that would be required was "substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the state." (Citing Reynolds.)

. . . It makes little sense to conclude from relatively minor "census population" variations among legislative districts that any person's vote is being substantially diluted . . . [t]otal population, even if absolutely accurate as to each district when counted, is nevertheless not a talismanic measure of the weight of a person's vote.

Gaffney v. Cummings, 412 U.S. at 744–746; accord, Martin v. Venables, 401 F.Supp. 611 (D. Del. 1975).

Burns v. Richardson, 284 U.S. 73 (1966), decided before Gaffney, is a case more in point. There the Supreme Court upheld an apportionment plan based on the distribution of registered voters, albeit at the same time expressing concern over the use of this basis due to the fact that it might tend to vary with the degree of the electorate's political activity or the intensity of a particular political campaign. Burns v. Richardson, 384 U.S. at 92. It should be remembered, however, that we have a system of permanent personal registration and that the Burns Court went on to

opine that a system of permanent personal registration would ". . . contribute to the stability and accuracy of the registered voters figure as an apportionment base". (Id. at 97.)

■ Reading Burns and Gaffney together then, one might reasonably conclude that the Supreme Court would accept as passing constitutional inspection, an apportionment plan based on a system of permanent voter registration. The Martin v. Venables Court, for one, so concluded. This court does likewise.

■ In applying the distribution of registered voters test to our apportionment plan, this Court feels itself free to utilize the most recent figures available. We do not consider ourselves to be as firmly wedded to the 1970 census as does plaintiff. Courts need not use "total population figures derived from the federal census". Burns v. Richardson at 91. And Gaffney criticized the use of census figures.

These figures may be as accurate as such immense undertakings can be, but they are inherently less than absolutely accurate. Those who know about such things recognize this fact, and unless they are to be wholly ignored, it makes little sense to conclude from relatively minor "census population" variations among legislative districts that any person's vote is being substantially diluted. The "population" of a legislative district is just not that knowable to be used for such refined judgments. . . . The United States census is more of an event than a process. It measures population at only a single instant in time. District populations are constantly changing, often at different rates in either direction, up or down. Substantial differentials in population growth rate are striking and well-known phenomena. So, too, if it is the weight of a person's vote that matters, total population—even if stable and accurately taken may not actually reflect that body of voters whose votes must be counted and weighed for the purposes of reapportionment, because "census person" are not voters. Gaffney at pp. 745–746.

13

In this connection we should not overlook the fact that census population and other figures are available at ten year intervals while voter registration figures are kept current. I refuse, therefore, to confine myself to the "moment in time" of the 1970 census and its stale data, writing as I am, nearly six years after the statute at issue was enacted.

The most recent figures available to the court were those of the registered voters in the Virgin Islands as of November 30, 1977. These figures were obtained from the Office of the Supervisor of Elections for the Virgin Islands and were admitted at the hearing as an exhibit of the Court. That exhibit shows that as of November 30, 1977, there were 23,556 registered voters in the territory. Of this total number 12,081 resided in the District of St. Thomas-St. John, and the remaining 11,475 lived in the other district.[2]

■■ A test adopted by the U.S. Supreme Court in State reapportionment cases employs a procedure which results in a showing of the apportionment's maximum deviation. Within a certain range the Court has said that deviation is constitutionally permissible. Above that ceiling, and to a reasonably higher number an apportionment plan may yet be saved though the total maximum deviation exceeds the top limits of prima facie constitutionality if ". . . based on legitimate considerations incident to the effectuation of a rational state policy". Connor v. Finch, 97 S.Ct. 1828 (1977). Despite plaintiff's seeming disdain

---

[2] At the suggestion of plaintiff's counsel, the court obtained a second certification from the Supervisor of Elections. This too will be made a part of the record of this case as a court's exhibit. That exhibit reveals that as of November 2, 1976, the date on which the incumbent senators were elected, the number of registered voters were, District of St. Croix, 12,558, District of St. Thomas-St. John, 12,497, not that these were the number of those who actually voted on that day, as was mistakenly represented by counsel. Actually on that date 9,261 souls turned out to vote in St. Thomas-St. John while 9,052 entered the polls in St. Croix. And, incidentally, as of November 7, 1972 the breakdown of registered voters was St. Thomas-St. John, 10,927 and St. Croix 10,712.

for this procedure, this Court will follow and adhere to it.

The calculation involved is facile. The relevant population figure, in this case 23,556, is divided by the number of legislators (here 15) to yield the representation in an ideal district. The largest and the smallest actual districts are then compared with the ideal to see by what percentage they differ from it either by way of over representation or under representation. The two percentages are then added together, giving us the total maximum deviation.

As applied to our situation, we divide the total number of registered voters by the number of senators arriving at an ideal district containing 1,570.40 persons per senator. The District of St. Croix has 11,475 registered voters for its seven senators or 1,639.29 registered voters per senator. This differs from the ideal by 4.39% (i.e., 1,639.29% minus 1,570.40 divided by 1,570.40).

St. Thomas-St. John has 12,081 registered voters. For the sake of these computations we attribute 8 senators to that district. That yields us 1,510.13 persons per senator in the district. Using the formula set out in parentheses above, we find a difference from the ideal district of 3.84%. Totalling the two deviations we reach a maximum deviation of 8.23%. This falls within the 10% figure which the Supreme Court has set as the top limit of prima facie constitutional validity for state legislative apportionment plans. It is true that even measured by these figures, St. Croix is under represented while St. Thomas is over represented. The fact remains, however, that the maximum allowable deviation falls within the constitutionally accepted limits. Measured then against the standard of total voter registration it cannot be said that the apportionment plan fashioned by the Legislature of the Virgin Islands

15

discriminates to the extent that could be characterized as invidious and would warrant judicial intervention.

■ We take another look at the reapportionment plan, this time gauged by count of total citizen population.

The Legislature of the Virgin Islands enacted §§ 101 and 102 of Title 2 of the Virgin Islands Code in 1972. It had before it the 1970 census. That compilation contained information not only relating to total population but went on to group the islands population into several categories. Two of those groupings were persons found in the islands who were native born and those who were foreign born. Now with this information at hand, the Legislature could reasonably have decided to use total citizen population as the appropriate basis for apportionment.[3]

Although this Court has been particularly zealous to uphold the rights of legally resident aliens in the Virgin Islands, as for examples of resident alien children to a public education, see Hosier v. Evans, et al., 8 V.I. 27 (D.V.I. 1970) ; the right of lawfully resident alien children to apply for scholarship assistance from public funds, Chapman v. Gerard, et al., 8 V.I. 41 (D.V.I. 1970) and the right of aliens though not permanent residents to maintain an action for divorce, Williams v. Williams, 8 V.I. 244 (D.V.I. 1971) ; we have never held, as indeed we could never hold, that aliens have a right to vote nor that those illegally here are entitled to representation. The Legislature, therefore, would have been fully justified had it expressly used citizen's population as the apportionment base, assuming as it could have and indeed as was borne out by some of the testimony here, that many illegally present aliens were included in the total population figure of the decennial

---

[3] In reaching the decision to use citizen population over raw total population as the basis for its apportionment, a reasonable conclusion which the Legislature could have reached is that total population figures included many aliens, those legally present, and those illegally in our midst as well.

census. On that basis it would be clear that total population is an unreliable source from which to determine the number of persons entitled to representation.

Our Court simply cannot ignore the explicit statement of the Supreme Court in Burns v. Richardson, supra, to the effect that citizen population figures form a permissible apportionment basis. Id. at 91; see also Cohen v. Maloney, 410 F.Supp. 1147, n. 9 (D. Del. 1976); Martin v. Venables, supra at 615.

Comparing the citizen population then of the two legislative districts we find that the District of St. Thomas-St. John leads the District of St. Croix in that category by at least 296. If armed with those figures we for the moment adopt the simplism of plaintiff that under Reynolds v. Simms it is absolutely required that majority population must be accorded majority representation in a Legislature, and where, as here, there are only two districts, the district with the majority must have the greater number of senators,[4] it would be clear that the Legislature of the Virgin Islands acted in utmost fidelity to the Equal Protection Clause by adopting the apportionment scheme that it did. Citizen population being the basis of apportionment and the District of St. Thomas-St. John having more citizens, the majority of 15 being 8, St. Thomas-St. John would be entitled to 8 senators.

Thus judged, the apportionment plan would be unquestionably within the constitutional pale, and it should be noted too that the same reasoning would apply equally if voter registration had been considered and used by the Legislature as the apportionment base in 1972. The foregoing line of reasoning, however, is flawed by a totally false assumption, as is the basic contention of this plaintiff. The false premise is that the District of St. Thomas-

---

[4] Be that majority 5, 50, or 5,000, plaintiff insisted at oral argument the same result must obtain.

St. John has 8 senators while the District of St. Croix has but 7. Clear and compelling as this conclusion might be to plaintiff, the court remains far from convinced.

Examining the reapportionment plan in its entirety we observe, as has been mentioned before, that the 15th senator is elected at large by all of the voters of the Virgin Islands, subject only to the requirement that the at-large senator be a bona fide resident of the Island of St. John. This residency requirement, argues plaintiff, gives the District of St. Thomas-St. John 8 senators. But is this truly so? Does the mere fact of residence serve to make that senator a senator of the district in which he or she resides only? To so conclude is to close one's eyes to the fact that inasmuch as the senator-at-large's "tenure depends upon the [territory]-wide electorate he [or she] must be vigilant to serve the interest of all the people in the [territory], and not merely of people in his [or her] home district; thus in fact he [or she] is a [territorial] and not merely a district senator". Fortson v. Dorsey, 379 U.S. 433, 438 (1965); see also, Dallas County v. Reese, 421 U.S. 477, 478 (1975; Dusch v. Davis, 387 U.S., 112, 115 (1967).[5]

■ To successfully challenge the residency requirement it would be incumbent on plaintiff to show that this particular plan in fact operates impermissibly to dilute the voting strength of the voting population of the District of St. Croix. Any theoretical presumption that elected officials will represent the district in which they reside rather than the electorate which puts them in office, has to be soundly rejected. See Dallas County v. Reese, supra, at 481.

---

[5] While in Dallas County and Dusch all the senators were elected at large, a situation unlike ours, Fortson involved a situation in which there were district voting only for some senators and county wide voting for district senators in certain counties. In either situation, the rulings and language of the Supreme Court in these cases is certainly instructive in dealing with the instant case.

At all costs, the record in this case is totally devoid of any evidence that the senators-at-large, past or present, have in fact represented only the District of St. Thomas-St. John. There being no evidence on which this court can find that the requirement that the at-large senator be a resident of St. John, operates to impermissibly dilute the voting strength of voters in either district, I have no alternative but to conclude that the senator-at-large in this reapportionment plan is precisely that, a senator of all the people of the Virgin Islands and not a senator of either district generally, or the District of St. Thomas-St. John, in particular.[6]

It bears mention that the Court in Dusch v. Davis, supra accepted as an adequate reason for residency requirement the need to have representatives with some knowledge of rural problems which would be of interest to all districts. The Court looked at the history of the entire area and found that the plan was not an evasive scheme to avoid the consequences of reapportionment, or to perpetuate certain persons in office. The true test under Reynolds v. Simms is whether there is invidious discrimination. None was found in Dusch. None is present here.

■ In our situation we could easily consider St. John as a unique island in our Virgin Islands chain, its uniqueness redounding to the benefit and welfare of all the people of the Virgin Islands. An extensive National Park is located there. It caters to a special type of tourism and development. It might well be said that the Legislature had a legitimate interest in providing that it would always number among its members at least one person with knowledge of the St. John unique peculiarities. Accepting this rationale as the justification for the residence require-

---

[6] Whatever the proper justification, or lack thereof, of the requirement that the at-large senator reside on the Island of St. John, plaintiff has not shown that his vote as a "Crucian" is diluted thereby.

ment, I conclude without any difficulty whatsoever, that the senator-at-large, under the challenged reapportionment plan is a senator of neither of the two districts but rather of the territory as a whole.

■ As the foregoing demonstrates the present reapportionment plan of the Legislature of the Virgin Islands handily survives constitutional attack, whether judged on the basis of permanent voter registration or the alternate basis of citizen population. It remains only to mention in passing that even on the basis of gross population figures, the plan is not necessarily infirm. It is not unreasonable to maintain that the numerical superiority of the larger of two districts is not sufficient to call for the drastic imposition of judicial sanction which the plaintiff seeks. Given the acknowledged and widely recognized fallibility of the census takers, the difference of barely over 1,000 residents cannot be deemed substantial. Plaintiff must recognize that as the Supreme Court has said, "mathematical nicety is not a constitutional requisite". Reynolds v. Simms at 569, nor "hardly a workable constitutional requirement". Reynolds v. Simms at 577. Moreover, when the plan is viewed in its true light, i.e. 7 senators to each of the two districts and 1 senator-at-large, the total deviation between the two districts shrinks into insignificance. The Court would be ill advised to interfere with this apportionment plan on the basis of such a minor divergence.[7]

■ Finally, I deal with plaintiff's contention that the proceedings of the Legislature and the report of the consultant unmistakably indicate that the Legislature considered nothing but the total population figures of the 1970

---

[7] The total deviation is reduced to approximately 1.56% based on the 1970 census citizen population, 5.14% based on the registered voter population, and 3.48% based on the total 1970 census population, as compared to the deviations given earlier when 8 senators were allocated to the St. Thomas-St. John district.

decennial census in fashioning its reapportionment plan. Conceding the correctness of this contention I need only point out that in testing the validity of the statute under consideration, all doubts must be resolved in its support. Davies Warehouse Co. v. Bowles, 321 U.S. 144, 153 (1944); 2a, Sutherland, Statutory Construction, § 25.11 (4th ed. 1973).

 And since by its ruling the Court has turned back a constitutional challenge to §§ 101 and 102 of Title 2 of the Virgin Islands Code, the court feels compelled to mention that it has approached the task with which it was confronted with the presumption that the statute is constitutional. This is in accord with accepted canons of proper statutory construction in the constitutional sphere. The statute must be upheld if there is any state of facts either known to or which could reasonably be assumed by the legislative body which affords support for it. United States v. Five Gambling Devices Labeled "Mills", 346 U.S. 441, 448–49 (1953); Davies Warehouse Co. v. Bowles, 321 U.S. 144 (1944), United States v. Caroline Products Co., 304 U.S. 144, 152 (1938); Metropolitan Casualty Ins. Co. v. Brownell, 29 U.S. 580, 584 (1935). Also the enactment is to be favored with the additional presumption that the Legislature acted with integrity and with an honest purpose to keep within the constitutional confines. See State v. Karmel Merchandising Corp., 186 A.2d 352 (Me. 1962); 2a, Sutherland, Statutory Construction, § 25.11 (4th ed. 1973). Therefore, in testing the constitutionality of the Legislative enactment in question it is of no moment that the Legislature considered only total population figures of the 1970 census, for several state of facts already discussed amply support this apportionment conception.

Confronted with the foregoing precepts, and on the evidence before the court, the challenge mounted by plaintiff

must fail. Several means of apportionment were available to the Legislature. Conceivably, one better than that chosen could have been devised. The choice, however, is a political, not a judicial one. It is sufficient if the legislative option in no way trenches on protected constitutional rights. The existing plan of apportionment, I have found, in no way offends either the Due Process or Equal Protection Clauses of the Constitution of the United States extended to this territory by the Revised Organic Act, as amended. It follows that the complaint must be dismissed.