LATINO POLITICAL ACTION COMMITTEE, INC., et al., Plaintiffs,

v.

CITY OF BOSTON, et al., Defendants.

Civ. A. No. 82–2633–C.

United States District Court, D. Massachusetts.

July 26, 1983.

Opinion Corrected and Counts 4 and 5 Dismissed as Moot July 29, 1983.

On Motion to Intervene and For Stay Aug. 2, 1983.

Joseph L. Kociubes, R.J. Cinquegrana, Bingham, Dana & Gould, Boston, Mass., for plaintiffs.

Jacqueline L. Allen, William J. Smith, Harold J. Carroll, City of Boston Law Dept., Boston, Mass., for defendants.

## MEMORANDUM

CAFFREY, Chief Judge.

This matter came before the Court on plaintiffs' motion for summary judgment as to counts I, II, and III of their complaint, and on defendants' motion for summary judgment on the same three counts. Counts I through III allege that the Plan for district representation adopted by the City of Boston, which Plan establishes districts for the election of the members of the Boston City Council and the Boston School Committee, violates the "one person, one vote" standard mandated by the equal protection clause of the fourteenth amendment to the United States Constitution; 42 U.S.C. §§ 1981, 1983, and 1985(3); Article 9 of the Declaration of Rights of the Commonwealth of Massachusetts, and; Mass. Gen.Laws ch. 43, § 131.

*Parties*

The plaintiffs' represent, individually and as a class, all the residents and registered voters in the City of Boston. The named plaintiffs include the Latino Political Action Committee, Caucus Latino de Poliza Social

de Massachusetts, Inc. ("Latino PAC"), a non-profit organization formed in 1981 to influence the "selection, nomination, election or appointment of individuals to federal, state or local public offices ..."; the Black Political Task Force, a non-profit organization formed in 1979 to increase the political power of Black people and to ensure that federal, state, and local elected or appointed officers respond to the interests of Black people; Boston Peoples Organization, a non-profit incorporated membership organization founded in 1979 to encourage progressive participation in electoral politics in Boston. Plaintiffs also include individual residents of Boston who are of Puerto Rican ancestry, individual Black citizens, and one individual White citizen. Defendants are the City of Boston; Kevin H. White in his capacity as Mayor; the Boston City Council, the individual members thereof; the Boston School Committee, the individual members thereof; the Boston Election Commission and Michael A. Joyce chairman thereof.

*Facts*

At the present time the Boston City Council consists of nine members elected at-large from the entire City and the Boston School Committee consists of five members also elected at-large. The present term for membership in both groups is two years. In 1977, the Massachusetts legislature enacted a law which created an option, exercisable by municipal referendum, whereby Boston's voters could amend its then, and present form of city government. Chapter 549 of the Acts of 1977, Mass.Gen. Laws ch. 43, §§ 128–134.

Pursuant to Mass.Gen.Laws ch. 43, § 129, the following two binding referendum questions were placed on the November 3, 1981 ballot:

A BINDING REFERENDUM CHANGING THE STRUCTURE OF THE CITY COUNCIL TO PROVIDE FOR DISTRICT REPRESENTATION

1. Shall the City Council be composed of nine members elected from equally populous districts and, in addition, one member elected at large for every 120,000 residents of the City in excess of 150,000, for a term of two years, notwithstanding the present form of government relative to terms of office?

YES

NO

A BINDING REFERENDUM CHANGING THE STRUCTURE OF THE SCHOOL COMMITTEE TO PROVIDE FOR DISTRICT REPRESENTATION

1. Shall the School Committee be composed of nine members elected from equally populous districts and, in addition, one member elected at large for every 120,000 residents of the City in excess of 150,000, for a term of two years, notwithstanding the present form of government relative to terms of office?

YES

NO

Mass.Gen.Laws ch. 43, § 130 provides that if a majority of the total number of votes cast are in favor of adopting either or both of the above alternatives, they shall be adopted. In the 1981 election, both of the referendum questions were approved by a majority of the total number of votes cast.

After a majority of the voters approved the referendum questions, the City Council set out to devise a plan which would divide Boston into electoral districts as required by the enabling statute. Section 131 of the statute is the source of legislative guidance as to how the Council was to accomplish this task. It provides, in relevant part:

In cities which adopt both a new plan of city council and a new plan of school committee organization, the respective district lines shall be the same for both bodies. Each such district shall be compact and shall contain, as nearly as may be, an equal number of inhabitants, shall be composed of contiguous existing precincts, and shall be drawn with a view towards preserving the integrity of existing neighborhoods.

In establishing the districts in 1982, the City Council elected to use the 1975 state decennial census (state census) which showed a Boston population of 637,986.

The Council did not use the then-available 1980 federal census (federal census) which determined Boston's population to be 562,-994. The number of Boston residents reported in the 1980 federal census was 74,992 (11.8%) fewer residents than the number reported in the 1975 state census. The racial minority population of Boston based on the 1980 federal census is 205,115 or 36.43% of the total 1980 population. The breakdown is as follows: 126,229 or 22.42% Black; 36,068 or 6.40% Hispanic; 1,302 or .23% American Indian, Eskimo and Aleutian; 15,150 or 2.69% Asian and Pacific Islander; and 26,376 or 4.68% other. U.S. Bureau of the Census, "Census of Population and Housing, 1980: PL 94–171 Counts." The 1975 state decennial census does not break down Boston's population by race, but the percentage of minorities has steadily grown since comparable figures from the 1970 federal census which showed a total population of 641,071. The minority population in 1970 was 134,346 or 20.956% of the total population. The breakdown then was as follows: 104,707 or 16.33% Black, 17,984 or 2.805% Hispanic and 11,655 or 1.818% for all other racial groups described above combined. Boston Redevelopment Authority, "Boston Population Trends and Shifts by Neighborhood, Ward and Precinct, Census Tract District and Census Tract, 1980, 1975 and 1970."

On February 24, 1982, the City Council adopted an ordinance to implement its new plan by grouping the 22 wards and 223 precincts in Boston into nine electoral districts. On March 8, 1982, Mayor White approved the plan. The new plan provides that both the City Council and School Committee shall henceforth be composed of 13 members; nine members to be elected on the basis of one from each of the nine new Districts and four members to be elected on an at-large basis.

Prior to passage of the new plan, the City Council had available to it a report by the staff of the Boston Redevelopment Authority entitled, "Boston Population Trends and Shifts by Neighborhood, Ward and Precinct, Census Tract District and Census Tract, 1980, 1975 and 1970." This docu-

ment, which is appended to the Affidavit of Janice E. Ellis, submitted on behalf of defendants, and which was prepared specifically for the Boston City Council Special Committee on Electoral Districts, converted 1980 United States Census data into subtotals, by ward and precinct in Boston, for: total population; total Black population; and total Hispanic population. On the basis of this 1980 federal census data, Boston's total population is 562,994. Therefore, the population of nine approximately equal districts (the norm), should be 62,555 per district.

The districts actually established by the new plan contain, according to the defendants' own statement of the 1980 federal census figures, the following numbers of inhabitants which vary from the 62,555 norm as shown in the table below:

| District | Population | % Variance |
|----------|-----------|-----------|
| District I | 60,289 | – 3.6 |
| District II | 66,125 | + 5.7 |
| District III | 57,307 | – 8.4 |
| District IV | 53,253 | – 14.9 |
| District V | 56,291 | – 10.0 |
| District VI | 58,640 | – 6.3 |
| District VII | 64,711 | + 3.4 |
| District VIII | 64,920 | + 3.8 |
| District IX | 68,007 | + 8.7 |

The greatest variance above the norm is 8.7%, the percentage by which the 68,007 person District IX exceeds the norm of 62,-555. The greatest variance below the norm is 14.9%, the percentage by which the 53,253 person District IV falls below the norm. The resulting span of population variance between the largest and smallest district is therefore 23.6%.

Despite the availability of the 1980 federal census figures, the City Council chose to use the 1975 state census figures in apportioning the electoral districts. Using the state census, the districts as apportioned contain more nearly equal numbers of people with a variance from largest to smallest district of about 8 percent. The City Council allegedly based its decision to use the older state census on the following factors: the state census is used in apportioning state representative districts; the state cen-

sus was believed by the Council to be more reliable than the 1980 federal census which is presently under challenge in the courts; and the state census was used in all the proposals for the City Council districts. Defendants now also seek to justify their use of the 1975 state census by their reliance on a state law which did not even exist at the time they made their election as to which census to use. The recently enacted state law seeks retroactively to impose on the Boston City Council a duty to use the 1975 state census. Mass.Gen.Laws ch. 43, §§ 128–134, as amended St.1982, ch. 605, § 3.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where:

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

All the facts set forth above are established without dispute and are not in issue. There is no disagreement as to the adoption of the new plan, or as to the allocation of wards and precincts in that plan. Defendants themselves have provided the figures which establish a 23.6 percent variance among the districts, using the 1980 United States Census. There is, therefore, no genuine and material factual dispute.

Plaintiffs contend that because the variance of 23.6% between the most populous and least populous districts in the adopted plan is of such magnitude, the plan violates the constitutional "one person, one vote" standard.

In *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), the Supreme Court set forth the standard which governs all legislative apportionment, both state and federal:

> The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth, Seventeenth, and Nineteenth Amendments can mean only one thing— one person, one vote.

*Id.* at 381, 83 S.Ct. at 809.

In *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Supreme Court discussed fully the standards against which state legislative apportionment plans must be measured. The Court held that vote dilution by malapportionment "impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discrimination based upon factors such as race or economic status." *Id.* at 566, 84 S.Ct. at 1384 (citations omitted). It stated that "[p]opulation is, of necessity, the starting point for consideration and the controlling criterion for judgment in legislative apportionment controversies." *Id.* at 567, 84 S.Ct. at 1384, and further that

> [b]y holding that as a federal constitutional requisite both houses of a state legislature must be apportioned on a population basis, we mean that the Equal Protection Clause requires that a State make an honest and good faith effort to construct districts ... as nearly of equal population as is practicable.

*Id.* at 577, 84 S.Ct. at 1389–90.

 It should be noted that *Reynolds* involved state legislative bodies, as distinguished from congressional districting. The Supreme Court has stated that no population variance may be considered *de minimis* in federal congressional apportionment, and therefore any deviation from the norm must be justified by legitimate state interests. *See, e.g. Karcher v. Daggett,* —— U.S. ——, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983); *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); *Kirkpatrick v. Preisler,* 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969); *Wells v. Rockefeller,* 394 U.S. 542, 89 S.Ct. 1234, 22 L.Ed.2d 535 (1969). As the Court noted in *Reynolds v. Sims,* however, "[s]omewhat more flexibility may ... be constitutionally permissible with respect to state legislative apportionment than in congressional districting ... [when] based on

legitimate considerations incident to the effectuation of a rational state policy." *Id.* 377 U.S. at 578, 579, 84 S.Ct. at 1390, 1391.

■ The Supreme Court identified some state policy considerations which might justify some variance in state legislative districts as: the integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts and the recognition of natural or historical boundary lines. *Swann v. Adams,* 385 U.S. 440, 444, 87 S.Ct. 569, 572, 17 L.Ed.2d 501 (1967); *Reynolds v. Sims, supra,* 377 U.S., at 579, 84 S.Ct., at 1390; *Wyche v. Madison Police Jury,* 635 F.2d 1151, 1158 (5th Cir.1981). Nevertheless, within the realm of permissible reasons for deviation from the norm, variances are acceptable only if the resulting apportionment is based substantially on population and the equal-population principle is not diluted in any significant way. *Reynolds v. Sims, supra,* 377 U.S. at 578, 84 S.Ct. at 1390; *Mahan v. Howell, supra.* It follows, therefore, that the implementation of district representation for Boston's City Council and School Committee must be accomplished within the bounds of the above-described constitutional requirements.

Assuming that there may be cases in which a state or locality may be able to justify some population variance among districts in a legislative apportionment plan, there are limits beyond which any variance is unacceptable. Federal courts have held variances below ten percent *de minimus* for state legislative bodies, but have sanctioned variances above that level only where the state has shown a sufficient state policy justification. *See Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) (24.78 percent variance unconstitutional); *Kilgarlin v. Hill,* 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967) (same, 26.48 percent variance); *Swann v. Adams,* 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1965) (same, 25.65 percent variance). In *Mahan v. Howell,* 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the Supreme Court let stand a state apportionment plan with a 16.4 percent variance, but there it had been proven that this was the minimum variance possible without violating existing state political boundaries. *Id.* at 326, 93 S.Ct. at 986.

According to the 1980 federal census statistics, the population variance for districts in the new district plan for Boston is 23.6 percent and no justification based on any state policy has been demonstrated for this disparity.

As stated above, the enabling legislation for district representation is Mass.Gen.Laws ch. 43, §§ 128–134. The only criterion contained in that statute governing the division of Boston into districts is found in § 131 and provides, in full:

> Each such district shall be compact and shall contain, as nearly as may be, an equal number of inhabitants, shall be composed of contiguous existing precincts and shall be drawn with a view towards preserving the integrity of existing neighborhoods.

■ Section 131 requires a good faith effort towards achieving population equality among the various districts. And while the statutory provision does not require the use of a particular census, state or federal, interpreted in light of federal constitutional requirements, it requires the use of the most recent and most accurate figures available. Good faith cannot displace the one person, one vote requirement!

■ The City Council, in establishing the districts, elected to use seven-year-old, 1975 state census data rather than the data of the two-year-old 1980 United States census. Based upon the 1975 state data, the variance of population between the districts is 8 percent, in contrast to the 23.6 percent variance between districts revealed by the 1980 federal data. The Supreme Court requires an honest and good faith effort to construct districts as nearly of equal population as is practicable. *Reynolds v. Sims, supra,* 377 U.S., at 577, 84 S.Ct. at 1389. Assessed in light of this requirement, the City Council's decision to use the older, non-federal census data, rather than more recent federal census data, is impermissible.

Federal courts have expressed a common sense preference for the use of the most recent census data available in legislative apportionment. For example, in *Meeks v. Avery,* 251 F.Supp. 245 (D.Kan.1966), the court upheld the use of a more recent 1964 state census in lieu of the 1960 United States Census, where the state census was the product of an actual headcount and the plaintiffs had not challenged the accuracy of that data. In *Wells v. Rockefeller,* 273 F.Supp. 984 (S.D.N.Y.), *aff'd,* 389 U.S. 421, 88 S.Ct. 578, 19 L.Ed.2d 651 (1968), the Supreme Court, having found New York's congressional apportionment plan unconstitutional, suggested to the state legislature, but did not require, that more recent statistics could be used in aid of reapportionment, the Court stated:

> Had the population remained static, the court could specify the 1960 census as a base. However, no court could blind itself to the world of today. To use 1960 figures in many areas would be to enforce the disparity of which plaintiffs complain. . . . It may be suggested, however, that population statistics as of December 31, 1966 might well be capable of reasonable ascertainment from various sources to which the Legislature would have access. Such current figures should tend to reflect the radical population changes in the areas where such changes have occurred . . . Even if perfection cannot be achieved between now and 1973 [the year in which congressmen would take office, elected under a plan based on 1970 figures], improvement is worth the effort.

*Id.* at 991, 992.

In *Exon v. Tiemann,* 279 F.Supp. 603 (D.Neb.1967), a congressional districting case, the defendants in 1967 introduced evidence of a 1966 estimate of population in order to support their district plan. The court concluded:

> [T]hese estimates of an impartial University department are proper for consideration by this court . . . Such estimates would appear to have more validity than to use the 1960 Census figures. However, the Legislature may find some other

census or estimates even more reliable . . . We are saying that better evidence of population in 1967 is available than the blind use of the 1960 Census. *Cf. Meeks v. Avery,* 251 F.Supp. 245.

*Id.* at 608.

■ These cases support the proposition that the most recent census data is more reliable and is generally required in legislative apportionment plans.

■ Defendant contends that the federal census is not accurate, and bases this contention on the fact that the federal census is presently under attack in various federal courts throughout the country, including the Massachusetts Court. To date there has been no successful legal challenge of the 1980 federal census. *See, Carey v. Klutznick,* 653 F.2d 732 (2d Cir.1981) (rejected challenge to federal census); *Young v. Klutznick,* 652 F.2d 617 (6th Cir.1981) (same). Although Boston is challenging the more recent federal census in court, the filing and mere pendency of a lawsuit proves nothing. The federal census is presumed accurate until proven otherwise and is, therefore, the most recent and accurate measure of population before the Court today. *See Kirkpatrick v. Preisler,* 394 U.S. 526, 535, 89 S.Ct. 1225, 1231, 22 L.Ed.2d 519 (1969) (high degree of accuracy required to supplant population figures of prior decennial census); *Graves v. Barnes,* 446 F.Supp. 560, 568 (W.D.Tenn.1977) (same); *Dixon v. Hassler,* 412 F.Supp. 1036, 1040 (W.D.Tenn. 1976) (decennial figures controlling unless clear, cogent, and convincing evidence that they are not valid).

■ An additional matter remains for consideration. In December of 1982, the Massachusetts Legislature amended Mass. Gen.Laws ch. 43, §§ 128–134 *inter alia,* to require retroactively the use of the 1975 state census in apportioning the electoral districts. This action was taken despite the fact the City Council had *already* drawn the districts using the 1975 state census *before* the legislature passed that law. To the extent that the statute as amended, St.1982 ch. 605, § 3, attempts to require the use of

the most recent state decennial census, rather than the most recent and accurate census, state or federal, the statute is constitutionally impermissible. I rule that no legislative apportionment plan, even if established explicitly in advance by a state statute, may supercede the constitutional requirement of "one person, one vote." *See Gray v. Sanders, supra; Swann v. Adams, supra; Reynolds v. Sims, supra.* A fortiori a retroactive statute cannot do so.

■ Defendants in moving for summary judgment contend, and the Court agrees, that *Reynolds v. Sims, supra,* does not specifically *mandate* the use of the federal census in local reapportionment. Defendants further contend that the § 131 phrase "equal numbers of inhabitants" should be interpreted in conjunction with § 128, which requires use of the state census in determining the scope of Chapter 43. This is a strained statutory construction. Section 128 does not purport to govern the process of apportionment of district populations at all. Its sole purpose is to identify those cities to whom the district alternative is available, i.e. Boston, Springfield, and Worcester as of 1977, the year the statute was enacted.

The defendants further contend that the question of which census to use is a legislative one, and that the Boston City Council's decision to use the state census was a proper exercise of its legislative function, and made in good faith. Defendants argue that plaintiffs proper course of action is in the State House, and not in the federal courts, because local reapportionment is the task of local legislatures or of those organs of State government selected to perform it. *See Gaffney v. Cummings,* 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973).

It is too late in the day to argue that federal courts are not under a duty to ensure that rights under the Constitution and laws of the United States are not denied by state or municipal governments. While the apportionment task is primarily a political and legislative process, it must operate within constitutional parameters.

■ In sum, I rule that the City Council's legislative decision to use the older, state census has produced a legally impermissible result and therefore, was and is not in keeping with the constitutional mandate set forth in *Reynolds v. Sims, supra.* The Court rules, based upon the pleadings, answers to interrogatories, documents produced, affidavits, and attachments thereto, that the voting districts in the plan adopted by the City Council contain substantially unequal numbers of people based on the 1980 United States Census. The evidence in the record demonstrates that the population variance among voting districts in the new plan is 23.6 percent, which is greater than any variance previously tolerated anywhere in the country by the Supreme Court of the United States. The greatest variance previously allowed to stand by the Supreme Court was 16.4 percent, and this exceptional variance was tolerated only because it had been proven that it was the minimum variance possible without violating existing state political boundaries. *Mahan v. Howell, supra,* 410 U.S. at 326, 93 S.Ct. at 986. The unjustified variance in the present case is well in excess of the limits set in *Mahan,* and because of the fundamental nature of the rights at issue here, I rule that the population variance in the voting districts established under the new plan is *per se* invalid. The voting districts as apportioned are, therefore, unconstitutional. Plaintiffs' motion for summary judgment accordingly should be granted and defendants' motion for summary judgment should be denied.

Order accordingly.

On Motions to Intervene and for Stay

CAFFREY, Chief Judge.

This matter came before the Court on a motion to intervene filed by the Attorney General of the Commonwealth of Massachusetts pursuant to 28 U.S.C. § 2403(b). Upon consideration of 28 U.S.C. § 2403(b) the motion to intervene is allowed.

The matter also came before the Court on the basis of motions filed by the Attorney General (1) to stay pending appeal, (2) to stay pending receipt of evidence, (3) for

relief from judgment; on a motion filed by City Council defendants Iannella, Tierney, McCormack, McDermott, and Hennigan for stay pending appeal; and on a motion filed on behalf of Mayor White, Michael Joyce, Chairman of the Boston Election Commission, and the Boston Election Commission for stay pending appeal of the Order entered by this Court on Tuesday, July 26, 1983. Memoranda in support of the motions were filed by the movants. An opposition to the allowance of the motions, supported by a memorandum of law, was filed by plaintiffs.

A hearing was asked for by City Council defendants and by the Attorney General. Rule 12(e) of the Local Rules of this Court provides for a hearing only when ordered by the Court. Rule 12(d) provides that motions which are not set down for hearing will be decided on the papers submitted after an opposition has been filed and accordingly, I do so herein.

 In their memoranda, City Council defendants and the Attorney General contend that *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) and its progeny compel this Court to stay its order of July 26, 1983 so that the election process will not be disrupted. *Sims,* however, does not mandate that this Court issue a stay, but rather it directs the Federal Courts to consider the specific circumstances involved in a constitutional challenge, and the equities associated therewith. I have done so. In *Sims* the Supreme Court acknowledged that under certain circumstances, equitable considerations *might* justify a court in withholding immediate relief even though an apportionment scheme is found invalid. *Sims* in no way *requires* a Federal Court to allow an illegal election.

 While this Court is aware of the proximity of the upcoming elections and the likely ramifications of its July 26, 1983 order, the enormity of the constitutional defects inherent in the City's current apportionment plan dictates that this Court not allow the election to proceed on the basis of this patently illegal plan.

In this case all parties moved for summary judgment on the basis of their collective representation that there is no issue of material fact present in the record of this case. Having in mind that the facts underlying this case are uncontested and having in mind the clear and explicit directions of the Supreme Court of the United States set out in the cases cited in this Court's memorandum of July 26, 1983, I rule that there is no non-frivolous issue to be raised on appeal and accordingly, I rule that the motions for stay and for relief from judgment should be, and hereby are, denied.